## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

MDR UNITED LLC,

      Plaintiff,

      v.

WARRIOR HOME SERVICES, INC.,
RALPH DICKMEIS, JENS DICKMEIS,
and ROOF-IT-RALPH CONSTRUCTION
& RESTORATION, LLC, and
JONATHON COULSTON

      Defendants.

CIVIL ACTION

CASE No. 2:25-cv-5828

## **INTRODUCTION**

1.      Plaintiff MDR United LLC ("MDR United" or "Franchisor") is the national franchisor of Mighty Dog Roofing® franchises, which offer roofing, tarping, gutter, attic insulation, and other products and services to customers at commercial and residential locations under the Mighty Dog Roofing® mark. Defendants Ralph Dickmeis and Jens Dickmeis (collectively, the "Dickmeises" or "Guarantors") voluntarily entered into three (3) Franchise Agreements with MDR United (collectively, the "Franchise Agreements") pursuant to which they were granted the right, and undertook the obligation, to open and operate a Mighty Dog Roofing® franchised business within the three (3) protected territories located in Texas (the "Franchised Business"), as more specifically identified in the Franchise Agreements (the "Protected Territories"), for the duration of the ten (10) year initial term (the "Initial Term"). Shortly thereafter, the Dickmeises formed a legal entity, Warrior Home Services LLC (the "Franchisee"), and requested MDR United's consent to transfer the Franchise Agreements to the Franchisee, which consent was granted pursuant to the terms and conditions of the Assignment and Consent

to Transfer Agreement entered into by and between MDR United, the Dickmeises and the Franchisee. Defendants attended initial training and launched their Franchised Business. After one and a half (1.5) years of operating the Franchised Business, Defendants formed a new entity, Defendant Roof-It-Ralph Construction & Restoration LLC ("RCR"), and offering competitive services in the same territory in which they operated the Franchised Business (the "Competing Business") - a direct and blatant violation of their contractual obligations pursuant to the Franchise Agreements, including the in-term non-competition covenant. As a result, Defendants have materially breached their contractual obligations and caused significant, irreparable damage to MDR United. MDR United commences this action to enforce its rights and protect its franchise system.

## PARTIES

2.      Plaintiff MDR United is a Pennsylvania limited liability company with its principal place of business located at 95 N. Broad Street, Doylestown, PA 18901.

3.      At all times referred to herein, MDR United has engaged in business as a national franchisor of Mighty Dog Roofing® franchises, which offer products and services under the trade name "Mighty Dog Roofing".

4.      Defendant Ralph Dickmeis is an individual residing in the State of Texas with a residence at 1114 Cedar Street, Howe, Texas 75459.

5.      Defendant Jens Dickmeis is an individual residing in the State of Texas with a residence at 1114 Cedar Street, Howe, Texas 75459.

6.      Defendant Warrior Home Services, Inc. is a Texas corporation with its principal place of business located at 1114 Cedar Street, Howe, Texas 75459. Defendant Warrior Home Services, Inc. operates out of 1010 La Salle Drive Suite W6, Sherman, Texas 75909-1778.

7.      Defendant Roof-It-Ralph LLC is a Texas limited liability company with its principal place of business located at 1010 La Salle Drive Suite W6, Sherman, Texas 75090-1778.

8.      Defendant Jonathon Coulston is an individual residing in the State of Texas with a residence at 5295 N. Travis Street, Apt. 13305, Knollwood, TX 75092-4139. Collectively, the Guarantors, the Franchisee, the Competing Business, and Jonathon Coulston are "Defendants."

<u>**JURISDICTION AND VENUE**</u>

9.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different States as evidenced below.

10.      Further, MDR United LLC is a Pennsylvania limited liability company that is owned by JEZ Investments, LLC, JS Equity Holdings, LLC, and Patrick Kiessling.

11.      JEZ Investments, LLC is owned by Skolnick Holdings, LLC, a Pennsylvania limited liability company.

12.      Skolnick Holdings, LLC is owned by Joshua Skolnick.

13.      Joshua Skolnick is an individual and citizen of the State of New Hampshire.

14.      JS Equity Holdings LLC is owned by Jon Sabo.

15.      Jon Sabo is an individual and citizen of Georgia.

16.      Patrick Kiessling is an individual and citizen of North Carolina.

17.      Therefore, based on the citizenship of its members, the citizenship of MDR United is New Hampshire, Georgia, and North Carolina.

18.      The Dickmeises are individuals residing in the State of Texas.

19.      The Franchisee is a Texas corporation with a principal place of business in the State of Texas.

20.    The Competing Business is owned and operated by the Dickmeises.

21.    Therefore, the citizenship of the Competing Business is the State of Texas.

22.    Jonathon Coulston is an individual residing in the State of Texas.

23.    As a result, there is complete diversity of citizenship for the parties in this matter.

24.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States of America. Specifically, Plaintiff brings claims under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, which provides a federal cause of action for the misappropriation of trade secrets that are related to a product or service used in, or intended for use in interstate and foreign commerce and the Lanham Act, 15 U.S.C. § 1114(1), which provides a federal cause of action for trademark infringement.

25.    Venue is proper because pursuant to Article IV, Paragraph 7 of the Personal Guaranty, the parties expressly agreed that the proper venue for any action arising out of or under this agreement shall be brought in the United States District Court for the Eastern District of Pennsylvania. The parties also agree that the choice of law for this action shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania pursuant to Section 18.1 of the Franchise Agreements.

## **MIGHTY DOG ROOFING'S INTELLECTUAL PROPERTY**

26.    MDR United Holdings LLC is the owner and licensor of the federally registered trademark with the U.S. Patent and Trademark Office on the Principal Register, including but not limited to "Mighty Dog Roofing" for roofing consultation; roofing contracting; roofing installation; roofing repair; roofing services; repair of roofing (the "MDR United Marks"):

| MARK | REGISTRATION NUMBER | REGISTRATION DATE |
|------|---------------------|-------------------|

| | 7142068 | Aug. 22, 2023 |
|---|---|---|
| Mighty Dog Roofing | 6247298 | Jan. 12, 2021 |

**BACKGROUND**

27.    On July 28, 2023, MDR United and the Dickmeises executed three (3) Franchise Agreements with the Multi-Unit Addendum (the "Multi-Unit Addendum"), pursuant to which the Dickmeises obtained the right and undertook the obligation to operate Franchised Businesses for the duration of the Franchise Term with specifically identifiable, protected, and designated territories in and around the Franchisee Territories (the "Initial Franchise Agreements"). A true and correct copy of the Franchise Agreements with the Multi-Unit Addendum is attached as "Exhibit A."[1]

28.    MDR United and the Dickmeises also entered into an Addendum to the Franchise Agreements (the "Addendum") on July 28, 2023, which amended the payments and deadlines for the fees pursuant to Section 3 and 3.1 of the Franchise Agreements. A true and correct copy of the Addendum is attached as "Exhibit B."

29.    On August 22, 2023, MDR United, the Dickmeises and the Franchisee entered into an Assignment and Consent to Transfer Agreement (the "Assignment") with a Personal Guaranty Agreement (the "Personal Guaranty"). Pursuant to the Assignment, the Dickmeises assigned their right, title, and interest in and to the Franchise Agreements to the Franchisee, and the Franchisee

---

[1] The Franchise Agreements are identical, other than the Data Sheet indicating the Initial Franchise Fee and Exhibit C depicting each of the Protected Territories. For the sake of efficiency, please reference attached copy.

assumed all the Dickmeises' obligations, assignments, commitments, duties, and liabilities under the Franchise Agreements. A true and correct copy of the Assignment and the Personal Guaranty is attached as "Exhibit C."

30.    Pursuant to the Personal Guaranty, the Dickmeises' agreed to be personally bound by and personally liable for all the covenants, duties, obligations, and liabilities in connection with the Franchised Business under the Franchise Agreements. See id.

31.    The Franchisee commenced operation of the Franchised Business on November 13, 2023.

32.    The Franchisee ceased operations of the Franchised Business on or around April 21, 2025, and subsequently stopped reporting any data.

33.    The Franchise Agreements do not expire until July 28, 2033.

## THE FRANCHISE AGREEMENTS

34.    The Franchisee agreed to abide by and comply with all the terms and conditions set forth in the Franchise Agreements but have now failed to do so. Plaintiff, on the other hand, have upheld their contractual obligations pursuant to the Franchise Agreements.

*Full-Time Efforts*

35.    Pursuant to Section 7.10 of the Franchise Agreements, the Franchisee agreed that "Franchisee [sic] must devote his or her personal full-time attention, skill, best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory … Franchisee acknowledges that Franchisee's [sic] violations of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure…" See Exhibit A at § 7.10.

36.     Furthermore, pursuant to Sections 7.6.5 and 11.2.4 of the Franchise Agreements, the Franchisee agreed that the Franchisee must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business and the majority equity owner in the entity that becomes the Franchisee must work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill, and best efforts to the management and operation of the Franchised Business, respectively. See id. at §§ 7.6.5 and 11.2.4.

*Payment of Royalties and Fees*

37.     Pursuant to Section 3.4 of the Franchise Agreements, "…Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic fund transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provided to Franchisor for use in connection with EFT Program (the "EFT Account")..." See id. at § 3.4.

38.     Pursuant to Section 3.2 of the Initial Franchise Agreements, "Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) eight and one-half percent (8.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee")…" as described in Section 3.2.1 of the Franchise Agreements and further evidenced in Section 3 of the Multi-Unit Addendum. See id. at § 3.2.

39.     In the relevant part, notwithstanding anything contained in Section 3.2.1 of the Franchise Agreement, Section 3 of the Multi-Unit Addendum states the following:

a.  Minimum Royalty Fee. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor the following Minimum

Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have in operation:

| Mighty Dog Roofing Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13-24 | $750 | $438 | $333 | $281 | $250 |
| Months 25-36 | $875 | $563 | $500 | $469 | $438 |
| Months 37-48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49-60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the Minimum Royalty Fee obligation for any given week.

b. <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements").

| Mighty Dog Roofing Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13-24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25-36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37-48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49-60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

<u>See</u> Exhibit A at Ex. H at § 3.

40.    Pursuant to Section 3.7 of the Franchise Agreements, the Franchisee must pay Franchisor its then-current weekly advertising and brand promotion fee (the "Brand Fund Contribution"). <u>See</u> Exhibit A at § 3.7.

41.    Pursuant to Section 3.8 of the Franchise Agreements, the Franchisee must pay Franchisor, its affiliate, or its designated vendor its then-current monthly technology fee (the "Technology Fee"). <u>See id.</u> at § 3.8.

42.     Pursuant to Section 3.9 of the Franchise Agreements, the Franchisee must pay Franchisor, its affiliate, or its designated vendor all associated then-current start-up fees, monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call Center Fee"). See id. at § 3.9.

43.     Pursuant to Section 3.11 of the Franchise Agreements, the Franchisee must pay Franchisor, its affiliate, or its designated vendor a monthly then-current digital management fee (the "Digital Management Fee"). See id. at § 3.11.

44.     Pursuant to Section 3.20 of the Franchise Agreements, the Franchisee must pay Franchisor, its affiliate, or its designated vendor a then-current monthly accounting services fee for all bookkeeping, billing, and payroll services (collectively, the "Accounting Services Fee"). See id. at § 3.14. Collectively, the Brand Fund Contribution, Technology Fee, Call Center Fee, Digital Management Fee, and Accounting Services Fee are hereinafter referred to as the "Fees").

*Confidential Information*

45.     Pursuant to Section 5 of the Franchise Agreements, the Franchisee agreed to the following:

5.1. **Non-Disclosure**. During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon termination or expiration of this Agreement, regardless of reason. Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2. **Confidential Information.** Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business

plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Franchised Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3. **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4 **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without identification, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

See Exhibit A at §§ 5.1 - 5.4; see also Exhibit C at Ex. A at Article II.

*Covenants*

46.     Pursuant to Section 17 of the Franchise Agreements, the Franchisee agreed to the following:

> Franchisee acknowledges that as a participant in the Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchises agree as follows:
>
> 17.1 **During the Term of This Agreement.** During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:
>
> 17.1.1 **Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts, or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location** provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;
>
> \*     \*     \*
>
> 17.1.3 **Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.**
>
> See Exhibit A at § 7.1; see also Exhibit C at Ex. A at Article III (emphasis added).

*Abandonment*

47.     Pursuant to Section 15.2.14 of the Franchise Agreements, MDR United has the right to immediately terminate the Franchise Agreement "If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms

of this Agreement for seven (7) days or more without Franchisor's prior written consent." <u>See</u> Exhibit A at § 15.2.14.

48.     Pursuant to Section 2.1 of the Franchise Agreements, the Franchise Term will not expire until July 28, 2033. <u>See</u> Exhibit A at § 2.1.

<u>**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**</u>

49.     Pursuant to Sections 5.2 and 17.4 of the Franchise Agreements, the Franchisee is responsible for ensuring their principals, managers, employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement attached to the Franchise Agreement as Exhibit C. <u>See</u> Exhibit A at Ex. C.

50.     Upon information and belief, Franchisee provided Defendant Jonathon Coulston with a Confidentiality and Restrictive Covenant Agreement pursuant to the Franchise Agreement. <u>See id.</u>

51.     Upon information and belief, Defendant Jonathon Coulston executed the Confidentiality and Restrictive Covenant Agreement, which included a non-disclosure and non-competition covenant. <u>See id.</u>

52.     Pursuant to the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston acknowledged and agreed that "..I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position…" <u>See id.</u> at ¶ 5.

53.     Further, pursuant to the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston acknowledged and agreed "…I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons,

12

partnership, corporation, or limited liability company, own maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks." See id. at ¶ 6.

## THE COMPETING BUSINESS

54.    The Guarantor registered Roof-It-Ralph Construction & Restoration LLC ("RCR") on May 22, 2024, and subsequently commenced operation of a competitive business. See the filing documents with the Texas Secretary of State attached as "Exhibit E-1" and "Exhibit E-2".

55.    The Guarantors formed RCR and operated the Competing Business approximately six (6) months after the opening of the Franchised Business on November 13, 2023.

56.    The Guarantors created a website to post content and generate leads for the Competing Business on May 21, 2024.



57.     Upon information and belief, the Guarantors directed business and revenue through the Competing Business to avoid their contractual obligations with MDR United. For instance, the Competing Business published blog posts, including stories about the roofing process:



58.

<u>See</u> the Competing Business Website at https://roof-it-ralph-construction.ueniweb.com/

59.    According to the filing details and website page, RCR and Guarantors began operating the Competing Business prior to the cessation of operation of the Franchised Business.

60.    At the time that the Guarantors formed RCR and launched the Competing Business, the Franchise Agreements were in full force and effect.

61.    The Competing Business Website explicitly lists Defendants Ralph Dickmeis and Jonathon Coulston as the Owners of RCR.



<u>See id.</u>

62.    RCR and Guarantors developed an interactive website for the Competing Business that offers a gallery of photos, list of services, and consultation scheduling link.



See id.

63.    RCR and Guarantors are advertising a variety of services under the Competing Business, including roofing solution, siding services, gutter systems, and window & door replacement:



See id.

64.     The Competing Business offers commercial and residential roofing installation, repairs, and replacements; new siding; gutter installation, repair, and maintenance; and upgrades to energy-efficient windows and doors. MDR United franchisees offer the very same products and services, in addition to other ancillary services, as the Competing Business. See id.

65.     The Guarantors and RCR have promoted the extended wide array of products and services offered through the Competing Business that were also offered by the Franchised Business. For instance, the Competing Business prominently advertises roofing work on YouTube:



See https://www.youtube.com/watch?v=Y6z69CTMt4Q

66.     RCR used MDR United branded trucks in connection with the operation of the Competing Business, as evidenced by the photographs displayed in the Competing Business youtube video which show an MDR United truck in the driveway:



See https://www.youtube.com/watch?v=xbwiaVBWUhQ

67.     RCR and Warrior Home Services, Inc. are operating out of the same location at 1010 La Salle Drive, Suite W6, Sherman, Texas 75090-1778.

68.     Defendants misappropriated the business reputation and goodwill of MDR United by improperly using MDR United trucks at roofing jobs for the Competing Business and subsequently using the MDR United trucks in promotional materials for the Competing Business, constituting trademark infringement, creating brand confusion and false advertising.

69.     The Guarantors benefited from the knowledge and know-how learned through their experience in investing in the Franchised Business in connection with the operation of the Competing Business.

70.     The Guarantors and RCR continue to use MDR United's proprietary system, confidential information, and trade secrets in connection with the operation of the Competing Business

71.     The Guarantors and RCR continue to promote the exterior home improvement services for the Competing Business in and around Northern Texas area, as depicted in the screenshot:



<u>See</u> the Competing Business Website at https://roof-it-ralph-construction.ueniweb.com/

72.    Upon information and belief, the Guarantors and RCR grew the Competing Business by actively soliciting current, former, and prospective customers of MDR United.

73.    Upon information and belief, the Guarantors and RCR are actively soliciting prospective customers through the Competing Business in violation of the non-competition covenants.

74.    Upon information and belief, Defendants have continued to purchase materials from MDR United's designated vendors and suppliers to perform roof installation, siding installation, window installation, and other products and/or services authorized or offered for sale by MDR United franchisees in connection with the operation of the Competing Business.

## **<u>MATERIAL BREACHES OF THE FRANCHISE AGREEMENTS</u>**

75.    The Franchisee failed to dedicate their full-time attention, skill, and best efforts needed to manage and operate the Franchised Business and to promote and increase the demand for MDR United's products and services, as required by Section 7.10 of the Franchise Agreements.

76.    The Franchisee violated and continues to violate the in-term non-competition covenant set forth in Section 17.1 of the Franchise Agreements.

77.    The Franchisee violated and continues to violate the restrictive covenants, as required by Sections 5 and 17.1 of the Franchise Agreements as well as Articles II and III of the Personal Guaranty, through the operation of the Competing Business.

78.     The Franchisee failed to maintain sufficient funds in the EFT Account to cover the necessary payment of the required minimum royalty and fees, as required by Section 3.4 of the Franchise Agreements.

79.     The Franchisee failed to pay the required minimum royalty, as required by Section 3.2.1 of the Multi-Unit Addendum, and other fees, as required by Sections 3.7, 3.8, 3.9, 3.11, 3.14, and 3.20 of the Franchise Agreements.

80.     As of the date of this Complaint, the Franchisee has an outstanding balance of $5,104.50 in past due fees under the Franchise Agreements. A true and correct copy of the outstanding balance from the royalty and fees owed to MDR United is attached as "Exhibit D."

81.     The Franchisee has ceased operation and abandoned their Franchised Business – a material default pursuant to Section 15.2.14 of the Franchise Agreements.

82.     The Franchisee is obligated to pay MDR United Minimum Royalty Fees for the duration of the Initial Term pursuant to Section 3.2.1 of the Franchise Agreements.

83.     As a result of the Franchisees' material breach and abandonment of the Franchised Business, MDR United will be damaged in the amount of expected future royalties or accelerated damages clause from the Franchised Business for the three (3) Protected Territories pursuant to Section 3.2.1 of the Multi-Unit Addendum.

84.     Pursuant to Section 3.2.1 of the Multi-Unit Addendum, the entire amount of the Minimum Royalty Fee for the remaining period on the initial ten-year term for the Initial Franchise Agreements Additional Franchise Agreement collectively totals $943,677.00.

85.     The Franchise Agreements do not expire until July 28, 2033.

86.     As a result of the Franchisee's and Guarantors' other contractual violations and unlawful conduct, including violating the non-disclosure provision and in-term non-competition

and non-solicitation covenants, MDR United has suffered irreparable harm and has suffered monetary damages in a yet to be determined amount.

87.    As previously noted, Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for these breaches pursuant to the express terms of the Personal Guaranty.

**MATERIAL BREACHES OF THE**
**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**

88.    Pursuant to Paragraph 4 of the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston is disclosing Confidential Information in connection with the operation of the Competing Business, which is a violation of the terms and conditions. See Exhibit A at Ex. C at ¶ 4.

89.    Pursuant to Paragraph 5 of the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston has an ownership interest in and/or employment position with the Competing Business, which is a violation of the terms and conditions. See id. at ¶ 5.

90.    As a result of Defendant Jonathon Coulston's contractual violations and unlawful conduct, including violating the non-disclosure, non-competition, and non-solicitation covenants, MDR has suffered irreparable harm and has suffered monetary damages in a yet to be determined amount.

**TORTIOUS INTERFERENCE**

91.    Defendant Jonathon Coulston is the General Manager of the Franchised Business.

92.    Defendant Jonathon Coulston has an ownership interest in and/or employment position with the Competing Business, RCR.

93.    Upon information and belief, Defendant Jonathon Coulston and RCR remain fully aware of the Franchise Agreement, Personal Guaranty, Assignment, and other agreements

executed by the Guarantors and the Franchisee.

94.     Upon information and belief, Defendant Jonathon Coulston and RCR remain fully aware of the contractual obligations of the Guarantors and the Franchisee, including but not limited to the confidentiality, non-competition, and non-solicitation covenants.

95.     Upon information and belief, Defendant Jonathon Coulston and RCR remain fully aware that the Franchise Agreements have not yet expired.

96.     Defendant Jonathon Coulston was not a party to the Franchise Agreements, nor was RCR.

97.     Defendant Jonathon Coulston was personally involved with the Franchised Business as General Manager and is keenly aware of inner workings of the Franchised Business.

98.     As the General Manager of the Franchised Business, Defendant Jonathon Coulston has direct knowledge of and control over the marketing, operations, and use of business materials, including MDR United's Confidential Information, which were later utilized by RCR in connection with the Competing Business.

99.     Despite this knowledge, Defendant Jonathon Coulston and RCR continued to support and participate the operation of the Competing Business, knowing that the Guarantors and the Franchisee had not complied with their contractual obligations pursuant to the Franchise Agreements.

100.    Defendant Jonathon Coulston and RCR further knew that the launch and promotion of the Competing Business violated the confidentiality and non-competition provisions of the Franchise Agreements.

101.    Defendant Jonathon Coulston and RCR intentionally and improperly interfered with the contractual obligations under the Franchise Agreements owed by the Guarantors and the

Franchisee to MDR United by encouraging, assisting, and enabling their breach of contract and other violations.

102.    Defendant Jonathon Coulston and RCR have no justification or privilege for his actions.

103.    As a direct result of Defendant Jonathon Coulston's and RCR's involvement and direction, customers associated the Competing Business with the Franchised Business, proprietary materials and confidential information were unlawfully used by the Competing Business, and prohibited goods and services were provided by the Competing Business – causing reputational and financial damage beyond the breaches of the Franchise Agreement alone.

104.    As a direct and proximate result of Defendant Jonathon Coulston's and RCR's tortious interference, Plaintiff has suffered damages, including loss of goodwill, competitive harm, and the unauthorized use of its intellectual property assets.

<u>COUNT I</u>
<u>BREACH OF CONTRACT: VIOLATION OF RESTRICTIVE COVENANTS
SET FORTH IN THE FRANCHISE AGREEMENTS</u>

**(AGAINST WARRIOR HOME SERVICES, INC., RALPH DICKMEIS, AND JENS
DICKMEIS)**

105.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

106.    On July 28, 2023, the Dickmeises entered three (3) valid and enforceable Initial Franchise Agreements, as amended by the Multi-Unit Addendum, with MDR United. These agreements governed the Franchised Business within the defined Protected Territories.

107.    On August 22, 2023, the Dickmeises assigned the rights to the Franchise Agreements to the Franchise pursuant to the Assignment and Personal Guaranty.

108.    Pursuant to Section 17.1 of the Franchise Agreements and Article III of the Personal

Guaranty, the Dickmeises and the Franchisee agreed, during the term of the Franchise Agreements, not to: (a) own, operate, or be affiliated with any business offering commercial or residential roofing installation, repairs, gutters, rain spouts or competing service; (b) solicit, direct or indirectly, any actual or prospective customers of MDR United or other MDR United franchises; and (c) induce MDR United employees or franchisees to leave their relationship with MDR United.

109.    The Franchise Agreements further provide that any violation of these restrictive covenants constitutes material breach of the agreements and cause for immediate termination and equitable relief.

110.    Notwithstanding these clear contractual obligations, the Dickmeises and the Franchisee launched and continue to operate the Competing Business.

111.    The Competing Business is owned and operated by the Dickmeises and offers the same or substantially similar services as the Franchised Business, within or near the same Protected Territories.

112.    The Dickmeises used the training and information they received through their investment in the Franchised Business in connection with the operation of the Competing Business.

113.    The Dickmeises also used MDR United's proprietary methods, confidential information, vendor contacts, and customer relationships to solicit existing or prospective MDR United customers in direct violation of their contractual obligations.

114.    The Dickmeises' operation of the Competing Business and solicitation of MDR United customers during the term of the Franchise Agreements constitutes a material breach of the Franchise Agreements and Personal Guaranty, including: (a) Section 17.1 of the Franchise Agreements; (b) Article III of the Personal Guaranty; and (c) related provisions prohibiting in-

term competition and misuse of MDR United's customer goodwill.

115.    Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for the Franchisee breaches pursuant to the express terms of the Personal Guaranty.

116.    As a direct and proximate result of these breaches, MDR United has suffered and continues to suffer irreparable harm, including damage to MDR United's relationships with its franchisees, loss of goodwill, loss of customers, loss of market presence, and loss of competitive positioning, and continues to suffer ongoing injury that cannot be adequately remedied through monetary damages alone.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and award the following relief:

A.    Compensatory damages in an amount to be proven at trial, including but not limited to lost royalties, lost profits, and other consequential damages resulting from the operation of the Competing Business and solicitation of MDR United customers;

B.    Preliminary and permanent injunctive relief enjoining Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and all persons acting in concert or participation with them, from: (a) operating or having any interest in any competitive business that offers commercial or residential roofing installation, repairs, gutters, rain spouts, or any other products and/or services authorized or offered for sale by MDR United franchisees, during the term of the Franchise Agreements; and (b) soliciting or attempting to solicit any current, former, or prospective customers of MDR United, or any customers identified through MDR United's confidential information or system during the term of the Franchise Agreements;

C.    Specific performance of the restrictive covenant provisions, including enforcement of the in-term non-competition and non-solicitation provisions of the Franchise Agreements and Personal Guaranty;

D.    An accounting of all revenues and profits earned by the Defendants Warrior Home Services, Ralph Dickmeis, and Jens Dickmeis from any and all business activities conducted in violation of the restrictive covenants;

E.    Disgorgement of all revenues and profits earned by Defendants Warrior Home Services, Inc., Ralph Dickmeis, and Jens Dickmeis from any business activities conducted in violation of the restrictive covenants;

F.    Attorneys' fees and costs incurred by Plaintiff associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty; and

G.    Such other and further relief as this Court deems just and proper.

### COUNT II
### BREACH OF CONTRACT:
### MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### SET FORTH IN THE FRANCHISE AGREEMENTS

**(AGAINST WARRIOR HOME SERVICES, INC., RALPH DICKMEIS, AND JENS DICKMEIS)**

117.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

118.    Pursuant to Section 5 of the Franchise Agreements and Article II of the Personal Guaranty, the Dickmeises and the Franchisee expressly agreed that all confidential, proprietary, and trade secret information disclosed or made available to them in connection with the Franchised Business would remain the sole property of MDR United and would not be used, disclosed, or

retained except for the purpose of operating an authorized MDR United franchise.

119.    The Franchise Agreements define "Confidential Information" broadly to include, but not be limited to: operational manuals, software and CRM systems, customer lists and contact data, pricing models, business strategies, vendor relationships, proprietary service methods, and marketing protocols, all of which derive independent economic value from not being generally known and are subject to reasonable measures to maintain secrecy.

120.    The Dickmeises and the Franchisee received extensive access to MDR United's Confidential Information during the course of their franchise relationship.

121.    The Dickmeises and the Franchisee launched and continue operating RCR - a competing business offering roofing installation, siding installation, and window installation - using MDR United's Confidential Information and trade secrets to solicit customers, train employees, and manage business operations.

122.    The Dickmeises and the Franchisee's continued use, retention, and disclosure of MDR United's Confidential Information in connection with the operation of the Competing Business constitutes a material breach of the Franchise Agreements and Personal Guaranty, including, without limitation, Sections 5.1, 5.2, 5.3, and 5.4 of the Franchise Agreements and Article II of the Personal Guaranty.

123.    The Dickmeises and the Franchisee continue to misappropriate MDR United's Confidential Information for the benefit of their Competing Business.

124.    Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for the Franchisee breaches pursuant to the terms of the Personal Guaranty.

125.    As a direct and proximate result of these breaches, MDR United has sustained irreparable harm to its franchise system and franchisee relationships, competitive position, brand

integrity, and customer goodwill, and continues to suffer ongoing injury that cannot be adequately remedied through monetary damages alone.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and award the following relief:

A.    Compensatory damages in an amount to be proven at trial, including but not limited to damages resulting from the unauthorized use and misappropriation of MDR United's confidential and proprietary materials, customer data, and business systems;

B.    Preliminary and permanent injunctive relief enjoining the Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and all persons acting in concert or participation with them, from using, disclosing, retaining, or otherwise benefiting from MDR United's Confidential Information or trade secrets;

C.    Specific performance requiring Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis to return and/or destroy all materials, documents, software, or data derived from MDR United's Confidential Information in their possession, custody, or control;

D.    An accounting of all revenues, profits, and benefits derived by Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis through the use or disclosure of MDR United's Confidential Information and trade secrets;

E.    Disgorgement of all revenues and profits earned by the Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis from any business activities conducted through the use or disclosure of MDR United's Confidential Information and trade secrets;

F.    Attorneys' fees and costs associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty; and

G.    Such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT: FAILURE TO PAY ROYALTIES AND FEES SET FORTH IN THE FRANCHISE AGREEMENTS

### (AGAINST WARRIOR HOME SERVICES, INC., RALPH DICKMEIS, AND JENS DICKMEIS)

126.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

127.    Pursuant to Section 3.2 of the Franchise Agreements and Section 3 of the Multi-Unit Addendum, the Franchisee was contractually obligated to pay MDR United a weekly royalty.

128.    In addition, the Franchisee was obligated to pay a series of recurring fees, including but not limited to the Brand Fund Contribution, Technology Fee, Call Center Fee, Digital Management Fee, and Accounting Services Fee (collectively the "Fees").

129.    Section 3.4 of the Franchise Agreements requires the Franchisee to maintain sufficient funds in a designated EFT Account to allow MDR United to collect all amounts owed.

130.    The Franchisee failed to pay the required Minimum Royalty Fees and other Fees and failed to maintain sufficient funds in their EFT Account, in material breach of the Franchise Agreements, and Multi-Unit Addendum.

131.    MDR United has provided the Franchisee with statements reflecting an unpaid balance of $5,104.50 for royalties and fees due as of the date of this filing, and the Franchisee has failed to cure the outstanding amounts.

132.    Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for the

Franchisee breaches pursuant to the terms of the Personal Guaranty, which makes them jointly and severally liable for all payment obligations arising under the Franchise Agreements.

133.    As a direct and proximate result of the Franchisee's material breaches of the Franchise Agreements and the Personal Guaranty, MDR United has sustained financial loss in the form of unpaid contractual fees and royalties.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and award the following relief:

A.    Compensatory damages in the amount of $5,104.50 for the unpaid royalties and fees due under the Franchise Agreements, together with pre-judgment and post-judgment interest as allowed by law or contract;

B.    An order compelling full and immediate payment of all additional royalties, fees, penalties, and interest accruing under the Franchise Agreements following the filing of this action;

C.    Attorneys' fees and costs associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty; and

D.    Such other and further relief as this Court deems just and proper.

**COUNT IV**
**BREACH OF CONTRACT: ABANDONMENT**
**SET FORTH IN THE FRANCHISE AGREEMENTS**

**(AGAINST WARRIOR HOME SERVICES, INC., RALPH DICKMEIS, AND JENS DICKMEIS)**

134.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

135.    Section 15.2.14 of the Franchise Agreements provides that Franchisor may terminate the Franchise Agreements upon written notice to the Franchisee, through any conduct in which the Franchisee indicates a desire or intent to discontinue operations of the Franchised Business for seven (7) days or more without Franchisor's prior written consent.

136.    The Franchise Agreements are not set to expire until July 28, 2033.

137.    On or about April 21, 2025, the Franchisee ceased operating the Franchised Business without MDR United's consent and stopped reporting any data for seven days or more, constituting abandonment under Section 15.2.14 of the Franchise Agreement.

138.    MDR United did not authorize or approve any suspension, discontinuation, or abandonment of the Franchised Business.

139.    The Franchisee's abandonment was accompanied by their effort to launch and operate a competing business, RCR, offering the same or substantially the same products and services in breach of the Franchise Agreements and in bad faith.

140.    As a result of the abandonment, MDR United has been deprived of the continuing royalty stream and economic value of the Protected Territories assigned to the Franchisee under the Franchise Agreements.

141.    Based on the Minimum Royalty Fee provision set forth in the Multi-Unit Addendum, MDR United has calculated its future lost royalties or accelerated damages clause over the remaining term of the Franchise Agreements to total $943,677.00.

142.    Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for the Franchisee breaches pursuant to the terms of the Personal Guaranty, which makes them jointly and severally liable for all payment obligations arising under the Franchise Agreements.

143.    As a direct and proximate result of the Franchisee's material breach by

abandonment, MDR United has suffered significant damages, including but not limited to loss of future royalties, impairment of territorial exclusively, and disruption of its franchise system.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and award the following relief:

A.    Compensatory damages in the amount of $943,677.00, representing the Minimum Royalty Fees lost as a result of Defendants' premature abandonment of the Franchised Business;

B.    Pre-judgment and post-judgment interest at the applicable legal or contractual rate;

C.    Attorneys' fees and costs associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty; and

D.    Such other and further relief as this Court deems just and proper.

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT ("DTSA")
## 18 U.S.C. § 1836

### (AGAINST ALL DEFENDANTS)

144.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

145.    MDR United owns and has developed proprietary business systems, methods, processes, pricing tools, CRM and software platforms, vendor relationships, and customer data that are used in the marketing and delivery of services under the MDR United brand throughout the United States.

146.    The proprietary information constitutes "trade secrets" as defined in 18 U.S.C. § 1839(3), in that the information: (a) derives independent economic value, actual, or potential, from not being generally known or readily ascertainable by others who could obtain economic value from its disclosure or use; and (b) is subject to reasonable efforts by MDR United to maintain its secrecy, including through franchise agreements, confidentiality provisions, training protocols, limited-access software, and restricted disclosure.

147.    MDR United's trade secrets relate to products and services used in interstate commerce, satisfying the interstate commerce nexus required under 18 U.S.C. § 1836(b)(1).

148.    During the franchise relationship with MDR United, the Dickmeises and the Franchisee were granted access to MDR United's trade secrets and confidential information under contractual obligations that restricted their use and required return or destruction upon termination of the franchise.

149.    Defendants misappropriated MDR United's trade secrets by using that information to launch, operate, and expand a competing home improvement business, RCR.

150.    Defendants used and are continuing to use MDR United's trade secrets without consent and acquired such information through improper means and in breach of their contractual and legal duties, in violation of 18 U.S.C. § 1836(b)(1), § 1839(5), and § 1839(6).

151.    Defendants' misappropriation was willful and malicious, undertaken to harm MDR United's brand and to gain an unfair commercial advantage in the same market.

152.    Defendants Ralph Dickmeis and Jens Dickmeis are personally liable for misappropriation by virtue of their access and knowledge, direct participation and guaranty obligations under the Personal Guaranty.

153.    As a direct and proximate result of the Defendants' conduct, MDR United has

suffered and continues to suffer irreparable harm, including competitive loss, loss of customers, diminished goodwill, and unlawful enrichment.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, Roof-It-Ralph Construction & Renovation, LLC, and Jonathon Coulston, and award the following relief:

A.    Preliminary and permanent injunctive relief under 18 U.S.C. § 1836(b)(3)(A), enjoining Defendants and all those acting in concert or participation with them from: (a) Using, disclosing, or continuing to use MDR United's trade secrets; (b) operating any business that benefits from the misappropriation; and (c) retaining, accessing, or distributing any documents, data, materials, or systems derived from MDR United's trade secrets;

B.    Compensatory damages for actual losses and unjust enrichment caused by the Defendants' misappropriation of MDR United's trade secrets, as provided under 18 U.S.C. § 1836(b)(3)(B);

C.    Exemplary damages in an amount of up to two times the award damages due to the willful and malicious nature of Defendants' misappropriation, as provided by 18 U.S.C. § 1836(b)(3)(C);

D.    An accounting of all revenues, profits, and benefits derived by the Defendants through the use or disclosure of MDR United's confidential information and trade secrets;

E.    Disgorgement of all revenues and profits earned by Defendants from any business activities conducted derived by the Defendants through the use or disclosure of

MDR United's confidential information and trade secrets;

F.    Attorneys' fees and costs associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty as well as 18 U.S.C. § 1836(b)(3)(D); and

G.    Such other and further relief as this Court deems just and proper.

## COUNT VI
## TRADEMARK INFRINGEMENT IN VIOLATION OF THE LANHAM ACT
## 15 U.S.C. § 1114(1)

### (AGAINST ALL DEFENDANTS)

154.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

155.    Plaintiff MDR United is the owner of a valid and subsisting federal trademark registrations for the Mighty Dog Roofing® mark, which has been used continuously in interstate commerce to identify and distinguish Plaintiff's roofing and exterior service from those of others.

156.    Defendants, without authorization or consent from Plaintiff, have used the Mighty Dog Roofing® mark in commerce, including but not limited to: maintaining business listings for "Mighty Dog Roofing" while simultaneously operating the Competing Business and otherwise capitalizing on Plaintiff's mark to create consumer confusion such as using the vehicles and equipment from the Franchised Business still bearing the MDR United Marks.

157.    Defendants' actions constitute use in commerce of a reproduction, counterfeit, copy, or colorable imitation of Plaintiff's registered mark in connection with the sale, offering for sale, distribution, or advertising of services, in violation of 15 U.S.C. § 1114(1)

158.    Defendants' unauthorized use of Plaintiff's trademark is likely to cause confusion, mistake, or deception as to the source, affiliation, sponsorship, or approval of Defendants' services.

159.    Defendants conduct was intentional, willful, and undertaken in bad faith to exploit Plaintiff's goodwill, reputation, and franchise system.

160.    As a direct and proximate result of Defendants' trademark infringement, Plaintiff has suffered and continues to suffer irreparable injury, including but not limited to loss of control over its trademark, damage to brand reputation, diversion of customers, and loss of goodwill, for which Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and Roof-It-Ralph Construction & Renovation, LLC, and Jonathon Coulston, and award the following relief:

A.    Preliminary and permanent injunctive relief enjoining Defendants, and all persons acting in concert or participation with them, from using the Mighty Dog Roofing® mark or any confusingly similar designation in commerce;

B.    An order requiring Defendants to take corrective action, including but not limited to the removal of all unauthorized references to Plaintiff's mark from websites, social media, advertising, and public directories;

C.    An accounting of all revenues and profits earned by Defendants as a result of their infringing activities;

D.    Disgorgement of all profits wrongfully earned by Defendants in connection with their unauthorized use of Plaintiff's mark;

E.    Compensatory damages, including but not limited to lost royalites, lost profits, and harm to Plaintiff's goodwill and reputation;

F.    Treble damages, statutory damages, and/or enhanced damages as authorized

under 15 U.S.C. § 1117(b) due to the willful and intentional nature of Defendants'
infringement;

     G.    Attorneys' fees and costs associated with this action pursuant to Sections
16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal
Guaranty as well as 15 U.S.C. § 1117(a) based on the willful and intentional nature of
Defendants' conduct; and

     H.    Such other and further relief as this Court deems just and proper.

**COUNT VII**
**UNFAIR COMPETITION / MISAPPROPRIATION OF GOODWILL**

**(AGAINST ALL DEFENDANTS)**

161.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1
through 104 above as though set forth at length herein.

162.    Under the common law of Pennsylvania, unfair competition encompasses the
misappropriation of the reputation, goodwill, and business value of another through deceptive or
wrongful conduct.

163.    Defendants misappropriated Plaintiff's reputation and goodwill by: (1) exploiting
Plaintiff's confidential information, vendor relationships, and franchise know-how to operate the
Competing Business; and (2) utilizing MDR United Marks in connection with the Competing
Business.

164.    Defendants' actions were designed to and did confuse consumers, divert customers,
and trade upon Plaintiff's hard-earned goodwill in the marketplace.

165.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered and
continues to suffer damages, including loss of revenue, diminished brand reputation, and erosion
of its franchise system.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, and Jens Dickmeis, and Roof-It-Ralph Construction & Renovation, LLC, and Jonathon Coulston, and award the following relief:

A.    Preliminary and permanent injunctive relief enjoining Defendants from continuing to misappropriate Plaintiff's goodwill, vendor relationships, and other proprietary information in the operation of Roof-It-Ralph Construction & Renovation, LLC or any other competing business;

B.    Restitution and damages in an amount to be proven at trial, representing the value of the benefits Defendants wrongfully obtained by trading on Plaintiff's reputation and goodwill.

C.    An accounting of all profits wrongfully earned by Defendants through the misappropriation of Plaintiff's reputation, customer relationships, and goodwill.

D.    Disgorgement of all such profits and revenues, to prevent Defendants' unjust enrichment.

E.    Punitive damages where permitted under common law, in light of Defendants' willful and malicious misappropriation of Plaintiff's goodwill;

F.    Attorneys' fees and costs associated with this action pursuant to Sections 16.4, 17.5, and 22.8 of the Franchise Agreements and Paragraph 27 of the Personal Guaranty as well as if permitted by any equity or statutes; and

G.    Such other and further relief as this Court deems jut and proper.

## COUNT VIII
## UNJUST ENRICHMENT

### (AGAINST ALL DEFENDANTS)

166.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein. This claim is pled in the alternative pursuant Fed. R. Civ. P. 8(d)(2).

167.    At all relevant times, the Dickmeises and the Franchisee were granted access to MDR United's proprietary systems, business methods, pricing strategies, customer data, trade secrets, vendor relationships, and operational materials (collectively "Proprietary Materials").

168.    These Proprietary Materials were developed by MDR United through the expenditure of considerable time, effort, and financial resources and are not known to the public.

169.    The Dickmeises and the Franchisee wrongfully retained and used MDR United's Proprietary Materials during the launch and continued operation of RCR, a directly competing business offering substantially similar services in the same market.

170.    The Dickmeises and the Franchisee have continued to use MDR United's Proprietary Materials to solicit customers, generate business leads, operate a competing enterprise, and avoid the costs of independently developing their own systems and infrastructure.

171.    The Dickmeises and the Franchisee were unjustly enriched by the continued use of MDR United's confidential, proprietary, and trade secret information without compensation, license, or authorization, and at MDR United's expenses.

172.    Under the circumstances, it would be inequitable and unjust for the Dickmeises and the Franchisee to retain the benefit of MDR United's Proprietary Materials without compensating MDR United for the value received.

173.    MDR United has no adequate remedy at law in the event its contract claims are not fully upheld, and equity demands that the Dickmeises and the Franchisee be required to disgorge the gains and benefits derived from the wrongful use of MDR United's assets.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendants Warrior Home Services, Inc, Ralph Dickmeis, Jens Dickmeis, Roof-It-Ralph Construction & Renovation, LLC, and Jonathon Coulston, and award the following relief:

        A.      Restitution in an amount to be determined at trial representing the value of the benefits the Defendants unjustly received through the unauthorized use of MDR United's proprietary and confidential materials;

        B.      An accounting of all profits wrongfully earned by the Defendants through the operation of the competing business using MDR United's systems, customer data, or other proprietary assets;

        C.      Disgorgement of all revenues and profits earned by the Defendants through the operation of the competing business using MDR United's systems, customer data, or other proprietary assets;

        D.      Pre-judgment and post-judgment interest as permitted by law;

        E.      Attorneys' fees and costs associated with this action where permitted by equity or statute; and

        F.      Such other and further relief as this Court deems just and proper.

**COUNT IX**
**BREACH OF CONTRACT SET FORTH IN THE**
**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**

**(AGAINST DEFENDANT JONATHON COULSTON)**

174.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

175.    Upon information and belief, Defendant Jonathon Coulston entered into the

Confidentiality and Restrictive Covenant Agreement required by MDR United.

176.    Pursuant to Paragraph 5 of the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston agreed not to use or disclose MDR United's Confidential Information.

177.    Pursuant to Paragraph 6 of the Confidentiality and Restrictive Covenant Agreement, Defendant Jonathon Coulston acknowledged and agreed not to maintain, engage in, be employed by, or have any interest in a competing business.

178.    The Confidentiality and Restrictive Covenant Agreement provides that any violation of the restrictive covenants constitutes material breaches and calls for immediate relief.

179.    Notwithstanding these clear contractual obligations, Defendant Jonathon Coulston helped launched and continues to operate the Competing Business.

180.    Defendant Jonathon Coulston has an ownership interest in and/or employment position with the Competing Business, which offers the same or substantially similar services as the Franchised Business, within or near the same Protected Territories.

181.    Defendant Jonathon Coulston used the training and confidential information he received through his experience as General Manager of the Franchised Business in connection with the operation of the Competing Business.

182.    Defendant Jonathon Coulston had extensive access to MDR United's Confidential Information.

183.    Defendant Jonathon Coulston used MDR United's Confidential Information and trade secrets to solicit customers, train employees, and manage business operations.

184.    Defendant Jonathon Coulston also used MDR United's proprietary methods, materials, vendor relationship, and customer relationships to solicit existing or prospective MDR

United customers in direct violation of his contractual obligations.

185.    Defendant Jonathon Coulston continues to misappropriate MDR United's Confidential Information for the benefit of the Competing Business.

186.    Defendant Jonathon Coulston's continued use, retention, and disclosure of MDR United's Confidential Information, operation of the Competing Business and solicitation of MDR Untied customers constitutes material breaches of the Confidentiality and Restrictive Covenant Agreement.

187.    As a direct and proximate result of these breaches, MDR United has suffered and continues to suffer irreparable harm, including damage to MDR United's relationships with its franchisees, loss of goodwill, loss of customers, loss of market presence, and loss of competitive positioning, and continues to suffer ongoing injury that cannot be adequately remedied through monetary damages alone.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendant Jonathon Coulston, and award the following relief:

A.    Compensatory damages in an amount to be proven at trial, including but not limited to lost royalties, lost profits, and other consequential damage resulting from Defendant Jonathon Coulston's operation of the Competing Business, solicitation of MDR United customers, and unauthorized use and misappropriation of MDR United's Confidential Information;

B.    Preliminary and permanent injunctive relief enjoining Defendant Jonathon Coulston, and all persons acting in concert or participation with him, from (a) operating or having any interest in any competitive business that offers commercial or residential roofing installation, repairs, gutters, rain spouts, or any other products and/or services

authorized for sale by MDR United franchisees, (b) soliciting or attempting to solicit any current, former, or prospective customers of MDR United, or any customers identified through MDR United's Confidential Information or system; (c) using, disclosing, retaining, or otherwise benefiting from MDR United's Confidential Information;

C.      Specific performance of the restrictive covenant provisions, including the enforcement of the non-disclosure, competition, and non-solicitation provisions in the Confidentiality and Restrictive Covenant Agreement;

D.      An accounting of all revenues and profits earned by Defendant Jonathon Coulston from any and all business activities conducted in violation of the restrictive covenants or through the use or disclosure of MDR United's Confidential Information;

E.      Disgorgement of all revenues and profits earned by Defendant Jonathon Coulston from any business activities conducted in violation of the restrictive covenants or through the use or disclosure of MDR United's Confidential Information;

F.      An award of attorneys' fees and costs permitted under applicable law; and

G.      Such other and furth relief as the Court deems just and proper.

## COUNT X
## TORTIOUS INTERFERENCE

### (AGAINST DEFENDANT JONATHON COULSTON AND ROOF-IT-RALPH CONSTRUCTION & RENOVATION, LLC)

188.    Plaintiff MDR United incorporates by reference the facts set forth in paragraphs 1 through 104 above as though set forth at length herein.

189.    Valid and enforceable contracts existed between Plaintiff and the Defendants Warrior Home Service, Inc, Ralph Dickmeis, and Jens Dickmeis, including but not limited to the Franchise Agreements and the Personal Guaranty.

190.     The Franchise Agreements imposed material obligations on Warrior Home Service, Inc, Ralph Dickmeis, and Jens Dickmeis including but not limited to maintaining the confidentiality of MDR United's proprietary and confidential information, refraining from competing with MDR United, and soliciting customers from MDR United.

191.     At all relevant times, Defendant Jonathon Coulston and RCR were aware of the Franchise Agreements and the Personal Guaranty and their respective terms.

192.     Defendant Jonathon Coulston's direct involvement as the General Manager of the Franchised Business and owning and operating the Competing Business, RCR, demonstrates his and RCR's actual knowledge.

193.     Despite this knowledge, Defendant Jonathon Coulston and RCR intentionally and without justification interfered with these agreements by assisting Defendants Warrior Home Service, Inc, Ralph Dickmeis, and Jens Dickmeis to continue using MDR United's Confidential Information in breach of the confidentiality and non-disclosure covenants, encouraging or facilitating the launch and marketing of the Competing Business that unlawfully incorporates MDR United's Confidential Information, in violation of the non-competition obligations, and failing to continue to operate the Franchised Business pursuant to the terms and conditions set forth in the Franchise Agreements.

194.     Defendants Jonathon Coulston and RCR were not a party to the Franchise Agreement or the Personal Guaranty and had no legal privilege or justification for interference with the contractual obligations of Defendants Warrior Home Service, Inc, Ralph Dickmeis, and Jens Dickmeis.

195.     As a direct and proximate result of their interference, MDR United has suffered damages including reputational harm, loss of brand control and goodwill, consumer confusion,

competitive harm, and the misappropriation of confidential information and proprietary assets.

196.    Defendant Jonathon Coulston's and RCR's conduct was intentional, malicious, and in bad faith.

**WHEREFORE**, Plaintiff MDR United respectfully requests that this Court enter judgment in its favor and against Defendant Jonathon Coulston and Roof-It-Ralph Construction & Renovation, LLC, jointly and severally, and award the following relief:

A.    An award of actual and consequential damages resulting from the tortious interference with the Franchise Agreements and the Personal Guaranty;

B.    An award of punitive or exemplary damages due to the willful and malicious nature of the interference;

C.    An award of pre- and post- judgement interest as permitted by law;

D.    An award of attorneys' fees and costs permitted under applicable law; and

E.    Such other and furth relief as the Court deems just and proper.

Respectfully submitted,

Dated: October 9, 2025

**FISHER ZUCKER LLC**
*/s/Christopher B. Alexander*
Christopher B. Alexander, Esq.
JoyAnn Kenny, Esq.
21 S. 21st Street
Philadelphia, PA 19103
(215) 825-3100
calexander@fisherzucker.com
jkenny@fisherzucker.com
*Counsel for Plaintiff MDR United LLC*